Good afternoon, Your Honors. May it please the Court. My name is Andrew Lee and I represent Appellant Cross-Appley Whitney Bank. Whitney is here today because the trial court badly misinterpreted a straightforward loan agreement between it and SMI. The agreement had a specific principal amount and a specified maturity date. The trial judge, without justification, disregarded the maturity date as not pertinent and converted the loan into one of indeterminate length. The trial court held, and I'm quoting, that Whitney's decision to call the loan rather than extend the maturity date breached the loan itself. That's at Record 3189. This was error as the court misapplied both the Louisiana Civil Code and the Louisiana Credit Agreement statute. The trial court then awarded damages to the borrower based on counterclaims that are precluded by the Louisiana Credit Agreement statute. This was also error. The contract interpretation error here is stark. The trial judge simply deleted the maturity date provision from the loan. He stated that the maturity date was not pertinent. Second, he inserted words in the purpose recital that weren't there. That recital states that the loan purpose is for an overline to provide funds for a particular contract with Halliburton. The trial court effectively modified this language to require Whitney to, in the judge's words, quote, fund that line of credit through the completion of SMI's contract with Halliburton. That phrase, through the completion, is a modification of the contract. It doesn't appear. This analysis violated both the Louisiana Civil Code and the Credit Agreement statute. First, Louisiana's law of contract interpretation is embodied in the Civil Code. And the essence of that interpretive code is in Article 2046, which states that when the words are clear, explicit, and lead to no absurd consequences, no further interpretation may be made in search of the party's intent. The loan agreement words, borrower will pay this loan, including all principal and accrued interest, on July 3, 2016, could not possibly be more clear, more explicit. What about the fact that the district court found or the magistrate judge found a conflict between that and the purpose statement and therefore was construing trying to harmonize those? Well, that's not actually, Your Honor, what the trial court found. The trial court never found a conflict other than introducing the testimony of Mr. Finn to suggest that the language of the maturity date was not pertinent, but recharacterizing the loan. But the court never found a conflict, never found an ambiguity. Well, the court didn't find it expressly, but isn't that the implication in what the court's doing? The only way to harmonize what he's done with the purpose clause would be to say that it's in conflict with the maturity date because the maturity date is clear. This is to be paid on July 3. So isn't that an implied finding here? Well, the question is, what is ambiguous? And if, in fact, the court were to say that he impliedly found the contract to be ambiguous, sitting de novo, Your Honor should look at these credit agreements and see whether it's ambiguous where it says the borrower promises to pay this all principal and accrued interest on July 3, 2016. It doesn't just say that. There are multiple other provisions in the contract that the court wrote out. And preparatory to that, Civil Code Article 2050 specifically says that the court can only construct a provision of the contract in light of the other provisions so that the contract is given the meaning suggested by the contract as a whole. And when the judge took the purpose clause, which was a recital and we've argued is not operative, but even if the court were to try to look at the purpose clause as an operative term, it has to be interpreted in light of the maturity provisions in order to satisfy Article 2050. But if the judge thinks it's the reverse, how can you be funding the Halliburton contract if you have an arbitrary, unextended maturity date that precedes – that was like a couple months before the thing would have finished out? Well, the fact of the matter is that the – now we have to get a little bit into the facts because when the loan was made in April of 2015, all parties agree that it was adequate to the task. It had a 12-month maturity date. And through no fault of Whitney's, which was not a party to the Halliburton contract, eight, ten months later, Halliburton finally comes on with a purchase order to SMI. That's when SMI re-approaches Whitney and said I need an extension, and it gave the extension of four months. And when those four months came is when we didn't further extend the loan. But all during that period, from April of 2015 through July of 2016, SMI is hemorrhaging cash. As a credit, it looks terrible. The testimony is clear that it went from positive shareholder value to negative $1.5 million in shareholder value. It's also clear that it went from negative $500,000 in net income in the first three months of 2016 to negative $1.5 million at the end of June. So when Whitney is revaluing this credit or reassessing this credit in July of 2016 and seeing that this company might not be good for it, then it's fully within its rights within the language of this contract not to renew. And if you took the judge's, I guess, purported harmonizing of the purpose provision to say, well, now you've got to fund it until the deal is done, then you have to write out also these other provisions, that Whitney had discretion in its sole judgment not to make any further loan advances to SMI. That's in the loan. That it had the right to refuse advances based on SMI's financial condition. That's at record page 3480. And to the maximum principal amount, because what Magistrate Judge Hanna did when he added these words through the completion to the recital was say, I don't care what it costs to complete this deal. You've got to lend it. And so $900,000 might not be enough. We've got to lend more than $900,000. And so you've got those. And then you've got the provisions in the loan that also say that the lender has no obligation to make loan advances if borrower is in default, if borrower becomes insolvent, or if borrower has a material adverse change in its financial condition. Finally, there's the provision that if any default occurs, the obvious, which is the lender ceases to have obligation to the loan and can refuse to make further loan advances. What I'm saying is there's simply no way to give any effect to the agreed upon maturity dates, which the borrower agreed in an extension of, and these other provisions, and to let stand the district court's ruling that Whitney should have funded the loan. I have a separate question about the good faith. How can it be good faith to be sending notices directly to, I guess, people who owe money to SMI, debtors of SMI, that are false? You owe money when you don't. You owe money when you've already paid it. You owe money, pay this lawyer. That's not contemplated by the deal, by the loan. So the bad faith findings by the judge, first of all, are based upon collection efforts on loan one, on the working capital loan. The working capital loan, the judge found that SMI breached it and that Whitney was entitled to collect it. But the judge got confused when it said the efforts that you're referring to were in bad faith because it already found that loan one was proper the way that we did it. Well, I mean, I suppose you can have a loan that's owed but then have also done bad faith on collecting it, and that would be the counterclaim. It might be offsetting, but nonetheless, I don't know that the two are inherently inconsistent. I mean, there's a loan that should be paid and the bad faith counterclaim. But in any event, if there are inconsistencies, the answer is not to necessarily ruin your favor but rather to send it back and ask the judge to resolve those. So let me address your direct question, though. The question of bad faith in Louisiana law is resolved in Favreau v. Favreau and the other cases that say you have to have an underlying breach to have bad faith. There aren't any independent causes of action for bad faith. But that is the breach. No. Well. The breach is writing, first of all, directly accessing the debtors before first telling SMI and then also lying or misstating or whatever the term is. Because I don't know how you could upend an already messed up business just to start writing their clients and saying you owe money you don't owe. That would be problematic. First of all. Send it to a lawyer because as soon as a lawyer gets involved, everybody gets nervous. But the problem is it's not a breach because it's contemplated in the agreement. Not just contemplated. It's expressed. Contemplated that they lied? No, I'm going to address these separately. Directly contacting account debtors is specifically authorized in the agreement which SMI agreed to. Tell me where that is. What I looked at said they first had to tell you and get you involved, you being the debtor. Right. And only then could they then go. That is what they argue in Grave Reef at page 6. And they point to our failure to coordinate with SMI. The reference is to record page 3454. At record 3454 you have the clause that they are relying upon. It says notice to obligors. And it says upon request by lender, borrower immediately will notify individual obligors with regard to the collateral, advising such obligors of the fact the lender has been granted a security interest in their obligations. Upon request by lender. In other words, borrower has to cooperate with lender. But we don't have to. In fact, separate visions say that we can directly collect from account debtors even before default. And these are standard forms. These are standard laser print forms that are used in the banking industry throughout. Direct collection from account debtors is not unusual. So that's the fundamental question you asked about. Why would you be contacting debtors directly about due bills? Okay. The second part about how- I didn't ask that, but that is one aspect. But I don't see anything, and maybe you can point me to it, that would authorize making false requests. Well, of course not. And that's not-there was no testimony that that was deliberate. In some instances we were going on the SMI accounts receivables forms that were the most recent. Whether deliberate or otherwise, it happened. Having-well, look, banks make mistakes all the time. And if the mistakes are to try to collect $922,000 from an account debtor versus $850,000, that's not a breach of the agreement. The agreement says, borrower, you've got to pay this money on July 3, 2016. Borrower let that date blow by without making any payment on their debt. That's when the creditor kicks into action to make sure they don't have a big loss. And sometimes in that haste you might mess up a few dollar figures, but it's not deliberate. There was absolutely no testimony in the record that any of those collection letters that contained- that contained errors were done with malice. Failing to follow this record 3454, it led to that. No, Your Honor, 3454 authorizes the lender to call upon the borrower to first reach out to the debtors. It doesn't require the lender to do that. Well, it says this thing about it will notify that upon request the grantor will make- grantor agrees that lender make forward appropriate notices. So it seems to me, obviously the grantor doesn't have the obligation to just do it sua sponte, so they've got to be requested by the lender. Once requested, they've got to do it. Then if they don't do it, then the lender can go off and write these letters that have to be appropriate. And I don't see how that happened here. Well, if you look at 3453, there's another provision. It's grantor's right to possession to collect accounts. In the center of that paragraph, it states, at any time and even though no event of default exists, lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to lender for application to the indebtedness. And it goes on. Until default and accept is otherwise provided below with respect to accounts. Correct. That's talking about possession of collateral. Three sentences after that. I'm trying to get to the meat of it where I said to you earlier that the loan allows direct collection from debtors prior to default even. These were all post-default. Now, I'm not arguing for prior to default because we didn't send out any notices, not even a default letter. No, I got that. I'm just still questioning the good faith of what you did. Not you personally, but what your client did. Sure. Well, so here we are in a situation, and I don't want to address your second part, you said, in calling a lawyer or retaining a lawyer to actually do the collections. No, no, no. Retaining the lawyer is not what I'm saying. What I'm saying is when you have a lawyer that's writing demand letters to customers of the debtor that are false, that's a scary thing for that company to receive, that client. That's what I'm saying. I'm saying the lawyer amps it up. I'm not saying it's improper to hire a lawyer. That would be a very bad thing as a lawyer to think. Well, that is one of the claims, though, that SMI has made, that we didn't have the right to retain a lawyer. No, your claim is that they didn't have the right to make the payment go to the lawyer, not that you didn't have the right to retain the lawyer. Specifically, it is, well, in any event, if you look at page 3456 of the record, it specifically authorizes the lender to hire or pay someone else to help enforce this agreement, and costs and fees are recoverable. I agree with you. I completely agree that they could hire a lawyer. I just am not sure that the use of the lawyer was proper. So then I would encourage you to look at the actual letters, because what you see in the briefing from SMI is that the activity was incorrect in some instances. There's no testimony that it was done deliberately where it was incorrect. Now, talking about statutory interpretation in the LCAS, we covered this in our brief, but I just want to go back to 1995 when Whitney v. Rockwell was decided, in which the Louisiana Supreme Court decided that a borrower in default who made the exact same counterclaim that they made here, bad faith breaches, that couldn't be heard under the LCAS. And further to Judge Haynes's question, King v. Parish National Bank rules out bad faith breach and bad faith acts under the LCAS. So I will reserve the rest of my time for rebuttal. All right. You've saved time for rebuttal, Mr. Green. Thank you, Mr. Ours. Good afternoon. My name is Ryan Ours. I'm representing SMI Companies Global, Inc., as well as Vaughn S. Lane, who are our athletes and cross-appellants in this matter. Undoubtedly, even before counsel's presentation, this Court understood Whitney Bank's position that essentially the Louisiana Credit Agreement statute bars all of SMI's claims and that ultimately this was just a very simple collection matter. As demonstrated by the record below, it surely is not. And in truth and reality, this matter impacts Louisiana business as a whole. A decision in favor of SMI will not be a cataclysmic tipping point to 80s-era lender liability. That is completely false. So what's the significance, if any, in your view of the maturity date? Of the maturity date? It is one provision of the contract that, as Judge Hanna did below, has to be read in pari materia with the rest of the loan. As Judge Haines, I believe, was getting to there, there is direct conflict in this particular instance on this contract with regard to the stated cause, the legal cause of the contract, and the fact that it is done very pro forma. I would agree that these forms are oftentimes used in banks all over. Well, so what I'm getting to is obviously the maturity date is a specific date. But if it has to be read in pari materia with other provisions, you can just take the maturity date out, just sort of whatever sounds right in terms of these other terms. There's no maturity date. The loan doesn't come due. I don't understand that. There was testimony from Mr. Campbell, who is the vice president and the bank officer, that extended the loan. The setup other than— Well, but under Louisiana law, you can't do that if it's not in writing. It's got to be in writing, doesn't it? Judge Smith, I agree. It has to be in writing. However, these one-year term on a revolving line of credit is the standard and is the norm. I would submit to you that the testimony of both Mr. Campbell as well as Mr. Finn, the expert, indicates and supports the fact that this is at the outset a one-year term because that's just standard. Mr. Campbell indicated that the first allonge, the first extension, was three months because that's just standard and that's just typical. At no point was SMI ever told that even though Whitney Bank made this commitment to fund this particular Halliburton contract, that the loan was going to be called. In fact, it didn't occur until July 21st when Mr. Vaughn Lane is on the phone with Mr. Campbell and says, I'm not talking to you anymore. The loan is going somewhere else. But my question is, if the maturity date—either the maturity date matters or it doesn't, which one? The maturity date matters, Your Honor. How is your argument consistent with the maturity date matter? Well, because I think we have to go one step further than Judge Hanna did, and you alluded to it, Judge Haynes. We've got a clear stated legal cause, and then we have a maturity date that become, in the real world of this contract, become irreconcilable. Okay? What you're suggesting is that any time the bank acknowledges the purpose of the loan, it becomes a joint—it becomes part of the joint enterprise. No, sir. I would respectfully disagree. The bank's got to stay in there until it's all over. No, sir. That was never the case, and the factual record doesn't support that, doesn't support the position. The bank knew all along that this project was nine to ten months to deliver all eight tanks. There was no question about that, and it is unrefuted in the factual record. What happened was there was a delay, so when the first draw happens in February of 2016, does the bank say, hey, you've got three months or two months to get this done. How is that going to work? You better go find another lender. Absolutely not, and these are not oral assurances with regard to contract. This is commercial reasonableness and bad faith, ultimately, in the handling of the contract. What does the bank say? We're with you. We're going through this. We're going to work through this. Look, it's going to be great. You have to understand the context of this particular contract and why I made my opening remarks. This is unique. This is very special, and it is, as Omer Davis, who had 20-plus years as a credit manager for this region for Whitney Bank, he had never seen one like this before. There's a reason why it was set up the way it was. Halliburton would be a set-aside. The collateral would not be commingled. The funds would not be commingled. So, Judge Dennis, back to your point, it would not be the normal case and the reason why the LBA position is nonsensical. This is fact-specific to this case, this contract, which doesn't just state, I would reject the notion of just purpose, even though that is what's on the four corners of the contract. But in this case, that is a clear expression of legal cause. That is a clear expression of what the two parties are agreeing to. You're telling us that the banks don't state the purpose of the loan? Banks do that all the time, don't they? Sure they do. In this case, Your Honor— That doesn't mean the bank is joining in the enterprise. No, sir. SMI's position is only that the bank should live up to the contract that it made. In this particular contract— They did. They loaned the money. They loaned the money. They never, by the way, loaned more than $900,000, even though the contract gives them the right to, whatever amounts they deem necessary. But in this particular instance, what the bank did was agree to a contract and a loan structure and arrangement that would see this project to the end. With all parties, the loan officer— Where does it say that? Sir? Where does it say that? It is in the— We'll see this to the end. We have to then go with the conflict between the stated cause and the maturity to do what Judge Hanna did and said, I'm going to look at extrinsic evidence to determine the intent of the parties. And that's precisely what the law requires. So when he goes to the extrinsic evidence to determine the intent of the parties, what does he find? Absolutely no equivocation among SMI or Mr. Lane or the Whitney Bank officers as to what the intent of the parties was, and that was to fund this particular Halliburton project through the end. Why? Because there would be no repayment by anyone, no payment from Halliburton to SMI and no repayment from SMI to Whitney Bank unless and until all eight tanks were delivered. That is the uniqueness of the situation that is represented in the factual record, and it is not standard. It is not typical. It is very unique, and it is why a finding in favor of SMI in this case has no precedential effect for any other person unless they have this very unique setup and loan arrangement that comes along according to Mr. Omer Davis once every 20-plus years. Now, conversely, if the bank can make these agreements, agree to cause, and then just pull the ripcord on it and abort an entire project and decimate a business, if that's okay in the light of this factual record and these contracts, then for the businessman who uses revolving lines of credit to fund overhead and pay employees, that paper means nothing because as trial counsel for the— The maturity date is a ripcord. I mean, most loan agreements have a maturity date. If you want to call that pejoratively a ripcord, that's up to you, but it doesn't make any sense to say fund it to the end and, oh, by the way, there's this maturity date that we have to read in paramateria. It just doesn't make sense. It does, Your Honor, if you look at the testimony of Mr. Finn, who was a qualified expert in commercial lending. It gives the bank an opportunity for interim checkups with their client, with their debtor, to what he called determine that the right controls are in place for the loan. And so the original launch that was extended from April to July didn't change any of the controls, although ultimately— One of your counsel officers said they did the checkup and the checkup showed a heart attack. I want to make sure I understand, Judge. They're saying that in July they looked at it and they had been hemorrhaging dollars, as he put it, so I'm making that analogous to a heart attack. Maybe that's not the right medical analogy. But in any event, they did the checkup, and they found a lack of help, we'll just put it that way, an extreme lack of help. And so if the point of the maturity date is to give them the ability to check up, they ought to also have the ability to say, we're not going to keep supporting this place that's in this mess. In certain circumstances, I would agree. But in this case where the agreement was made by the parties, legal cause has to mean something. It is one of the three essential elements to a contract in the state of Louisiana. It has to mean something. The contract doesn't say this is legal cause. It does not, Your Honor. It also doesn't say that we recognize that these two provisions are ambiguous. And just because Judge Hanna didn't use the word ambiguous, it is actually Whitney Bank who is pointing out the conflict in the two provisions. Because the contract clearly gives the bank the right to make extensions without defeating all of its rights under the contract. And it doesn't say anything that suggests that the bank has got to forbear enforcement of its rights until the debtor goes bankrupt or something like that, which you're suggesting. If we were to uphold your position, the banks would stop lending. I would respectfully disagree. You wouldn't be able to get a loan. Judge Dennis, what the eventuality would be, either if you render a decision in favor of SMI or even affirm the decision of Judge Hanna below, the ultimate would be no impact beyond these two parties. Because if Whitney Bank does what it's supposed to do with regard to the Halliburton line of credit, this is important factual that is not necessarily called out in the briefs. At the point in January, on July 21st, when Whitney Bank severs all contact and sends it to special assets, the Halliburton line of credit is below half of the principal limit, less than $450,000. The original line of credit, which has a $1.5 million limit on it, is about $1.1 million. There is false information given from the commercial side to special assets with regard to poor-performing contracts and putting put on COD from vendors. There was one instance where Halliburton decided, because of, again, a bad faith step by Whitney Bank, pays a vendor directly and then steps up to fill the breach, fill the void from what Whitney Bank is not doing. The factual record in this case is so unique that, Judge Dennis, I would submit to you that a decision in favor of SMI or even affirming the trial court doesn't have any effect beyond what these two cases and these particular contracts. Let me ask you this. If we were to conclude that there is not a conflict between the purpose and the maturity date, and the maturity date is enforceable, what would be left of your case, of your counterclaims, your claims? What would still survive that ruling? Well, what would be left with was the bank successfully selecting and deselecting terms of the four corners of the contract. What would be left with was a bank and the banking industry to be able to say we know all this. I don't think that's what Judge Haynes is asking. I think she's saying— We'd be left with an unrealized cause, I suppose, Your Honor. If we should decide that and remand it, what does the magistrate judge do at that point? What's left of the case? Do you still have a bad faith cause of action for their collection? Yes. For example? There's separate breaches— That's what I'm asking about. I'm sorry, Your Honor. I misread that. There are absolutely separate breaches in the handling of the loans and the execution of the loans, both the Halliburton line of credit and the dealings with— Tell us about those. Yes. The commercial reasonable standard and the good faith standard that are incorporated into Louisiana law and by adoption of the UCC pervade both contracts. There are multiple findings with regard to the handling of—even before the initiation of default with regard to the Halliburton line of credit and the way that special assets is dealing with this. They failed to regard any of the particular parameters of the contract. The two officers from special assets that went and made a site visit knew nothing about the case. They went there, and it's pretextual, and Judge Hanna agreed. They went there specifically to get a, as we called it, a forgive all sins was the terminology agreement, and then to coerce more money from a separate unrelated entity. All right, so what does Judge Hanna do with it at that point? Judge Hanna has already found that on the face of the agreement, without even going to extrinsic evidence, that the cause of the and the intent of the parties was to fund the Halliburton contract all the way through to completion. If you're—I understand. I just need to make that point. I'm running out of time. Not that point. But, Judge Haines, if— We're saying what if, and I realize, you know, I know this is hard for lawyers.  But, unfortunately, that's the way oral argument works, and you have to just try to go with it. So let's assume, arguendo, that we were to rule that the maturity date was, in fact, enforceable and was not overridden or pari materia or whatever with the purpose clause in any way. Would you still have a claim for bad faith because of their sending letters to clients that falsely stated what was due? In addition to the collection efforts, before it gets to collection, the handling of special assets, yes, with regard to both the Halliburton line— Okay. Walk us through those causes of action. Assuming arguendo, and I'll credit you with that. We're not going to say you conceded anything about that. But assuming arguendo, maturity date. Now, walk us through what's left. Prior to the expiration, there was an instance where payroll commitment was withdrawn, and Mr. Lane and a company that he owned separately was coerced to contribute $87,000 two hours before funding had to be made to cover his employees. That was the skin in the game. You'll see it right here. What is the cause of action that equates to that? The cause of action would be a bad faith and a lack of commercial reasonableness in the handling of the line of credit. What else? There is a rejection, an NSF, to a corrosion materials, which is a critical vendor to completing the Halliburton tank. There was a transfer of loans to special assets based upon false and misleading information. There is the special assets handling from the start where, if you'll look at record page number 3200, Judge Hanna lays out roughly 21-plus instances of breach, both of which apply to the Can you give me that record page again? Yes, Your Honor, 3200. That apply to both the Halliburton line of credit and the original line of credit. There is, as you move forward to the collections effort, there is a complete severance of communication with regard to what the bank is doing with SMI's property. Now, consider that for a second. Yes, the bank has rights, has a security right, but those contracts specifically provide that those receivables are the property of SMI, security interest notwithstanding. Those are the property. SMI has a right to keep collecting their own receivables. They had no idea what Whitney Bank was doing because Whitney Bank's counsel for special assets said, Don't talk to us anymore. Talk to our lawyer. And this was the, you know, they move forward with him trying SMI, trying to make contact with Whitney Bank's counsel, only to be left with and receiving information that you did X, Y, and Z, none of which were true. Didn't fail to, didn't disregard a forbearance agreement, didn't refuse to negotiate, didn't do any number of things that were included in the correspondence between counsel and SMI. What type of action does that argument support? It would fit, Your Honor, with the failure, the breach of the duty to act with commercial reasonableness and with good faith in the execution and implementation of these contracts. Now, how do you harmonize the failure to find a breach of the Loan I with the finding of bad faith as to Loan I? Well, we've also appealed, and that is an assignment of error. Judge Hannah goes to great lengths to talk about the actions that lack all commercial reasonableness or are in bad faith and fails to make the nexus between the impact and the consequence of those actions. It didn't just blow up the Halliburton deal and Halliburton canceled the contract. The actions of Whitney Bank's collection counsel destroyed the entire customer base of SMI. They couldn't pay back the original line of credit because they had no more customers. By that point, all of the customers had either been told that they were double paying or being threatened with a legal action or all manner of other things, all without and going back before time runs slow. Your Honor, you hit it on the provision of the notice to obligors requires that they make requests to the debtor to participate in the sending out of notices. Well, he's saying the provision on the page before undercuts that, that that just is one option. The granter's right of possession refers back to when the lender goes into collection mode. It doesn't change the fact that the notice to obligors requires that they first make a request, and we don't have to look any farther than this case. Whitney Bank did it right one time. David Campbell got the signature of Mr. Lane on behalf of SMI to send to Halliburton. You won't remit any money to SMI. You'll remit directly to the bank, which is the way the contract says it's supposed to do, supposed to operate. Not that you will, okay, forget everything you know about your customer or the person you owe money to. You'll send it directly not to the bank as contemplated by the contracts. You'll send it directly to our counsel. And what does that tell a customer base about the viability of a business when that happens? Not only they're calling and saying, what's going on? Are you guys shutting down? Are you going bankrupt? Is this a joke? We've never seen anything like this. That goes to the lack of commercial reasonableness and the direct breaches, Your Honor, the direct breaches from the contracts themselves with how any collections are supposed to be implemented. And I'd be remiss without pointing out, just because now with Whitney Bank, in this case, all of them agree, when you go to special assets, your business is done. That's what happens. Mr. Campbell and Mr. Schechter and I said we've got to keep you out of there. However, that doesn't have to be the case. SMI was an ongoing concern but for the subsequent actions of Whitney Bank through their counsel and special assets. I see I'm out of time. I appreciate the panel's time. Thank you, Mr. Howers. Mr. Lee for rebuttal. Thank you, Your Honor. SMI had lost $1.5 million as of net income as of July 1, 2016. Its AR was in such bad shape that a workout was not possible, but it was tried. So after they defaulted on July 3, 2016, the record will reflect that there were multiple attempts at working out the loan because it would have been in both parties' best interest for it to perform. Of course, Whitney Bank That's what I've wondered about in this case. It doesn't seem like what Whitney did made a lot of sense towards actually getting money. Well, ultimately Letting the Halliburton deal blow up doesn't seem to help them get that paid. You can certainly question the business decisions that were made here, but this is not the purpose of the case. No, I really, you were the one who brought it up. Yeah, I understand. I agree with you that it was very illogical, but that doesn't, as I agree, I agree, But what my opposing counsel points out in a couple of the comments that he made were bad faith breaches. Fully demonstrate how bad this company was. So he said, prior to default, Whitney failed to cover payroll. This is a company that couldn't pay its own payroll, had maxed out the working capital line of credit, and there was no more money to borrow. We have multiple references in the brief to the borrower saying, I have no more money that I can borrow under my borrowing base on the working capital line, but you've committed, Whitney, to forever cover payroll, language that cannot be found in these documents. And at the end of June 2016, Whitney said, why don't you cover this one? It's $87,000. Put some more skin in the game yourself, borrower, because you're maxed out. We've got no more money to lend to you. And they're calling that a bad faith breach. And they're also saying, and Mr. Orr has pointed this out, that when they had a check come through after July 3, 2016, after default, made out to corrosion materials for $87,000, that we've committed a bad faith breach by not covering a hot check that the borrower had already written and said will be presented for payment. Whitney, we want you to cover it. And that's a bad faith breach that not only is opposing counsel pointing out, but the trial judge found that we were obligated to cover a hot check that the borrower paid. This is the nature of the litany of bad faith breaches that the trial judge delineated at page 3200. And I'll point out that almost all of them are communication, failure to communicate with the borrower, but all but one, in addition to these other two, are after default. They're after default. And I point to this case in my principal argument, but Favreau v. Favreau, which issue of good faith unless and until we find that the party has failed to perform the underlying obligation. Bad faith doesn't stand alone as a cause of action. Now, the one that the Court lists in its 21 findings on page 3200 that I've already highlighted earlier, but it says this is a bad faith breach, too, is when the Court says that Whitney's failure to fund the Halliburton line of credit through completion, including if necessary, he says, an extension of the maturity date to a date after the delivery of the eight tanks being constructed. He says this multiple times in his reasons, but there it's very specific. It's until the delivery of the eight tanks being constructed raises the question, what if SMI fails to deliver the eighth tank? When do we get repaid? If we've got to continue lending until that eighth tank is constructed and delivered, when does Whitney get to collect its 900-plus thousand dollars that we've got out to this company? Under their construction, it's never. It's indeterminate, because the trial judge said you've got to wait until the eighth tank is delivered. So Mr. Orr relies on this Mr. Finn, and I didn't get a chance to talk much about him, except I do want to point one thing. He's now conceded that the trial judge went outside the record, outside the documents to extrinsic evidence. That was not conceded in the brief. They said it's all within the brief, within the four corners of the agreement. But we've now heard a concession that the trial judge did go to parole evidence without first finding ambiguity in the agreement, and there is none. What Mr. Finn found was this, or testified to, in which the court adopted, was that this was a, quote, unquote, production loan. Those words had never been used by the parties before he took the stand. No witness ever called it a production loan. No banker ever called it. It was this commercial banker expert who said this is a production loan, and you'll see these words echoed in Judge Hannah's decision. He adopts what Mr. Finn said hook, line, and sinker. It's a production loan, which means, says Finn, it has to be funded through completion of the underlying job. But the thing I want to point out about what Mr. Finn concluded and convinced Judge Hannah to adopt is that he also contradicted Mr. Lane himself, because if, in fact, the parties agreed that this is to be funded ad infinitum through production, that's not what Lane said when he wrote a letter in July of 2016, after default, record 4122. Thank you, Your Honor. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.